**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AMY T.,[1]

                                    **Plaintiff,**

    vs.                                                 **6:17-cv-1176**
                                                 **(MAD)**

COMMISSIONER OF SOCIAL SECURITY,

                                    **Defendant.**

_____

**APPEARANCES:**                       **OF COUNSEL:**

**AMY T.**
Utica, New York 13501
Plaintiff _pro se_

**SOCIAL SECURITY ADMINISTRATION**     **BENIL ABRAHAM, ESQ.**
Office of Regional General Counsel
Region II
26 Federal Plaza
New York, New York 10019
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Amy T. commenced this action on October 23, 2017, pursuant to 42 U.S.C. §

405(g), seeking review of a decision by the Commissioner of Social Security that she is no longer

entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the

"Act"). _See_ Dkt. No. 1. Currently before the Court is Defendant's unopposed motion for

judgment on the pleadings. _See_ Dkt. No. 13.

_____

[1] Due to privacy concerns implicated in Social Security appeals, Plaintiff will only be
identified by her first name and last initial.

# II. BACKGROUND

## A.     Procedural History

On March 10, 2009, Plaintiff was found disabled as of February 27, 2007. *See* Administrative Transcript ("Tr.") at 88-102. On July 15, 2014, a state agency disability hearing officer determined that Plaintiff was no longer disabled. *See id.* at 103. After Plaintiff's request for reconsideration was denied, she requested a hearing before an administrative law judge ("ALJ"). *See id.* at 111, 115-16, 137. ALJ Marie Greener scheduled a hearing on September 9, 2015, but postponed conducting the actual hearing to enable Plaintiff to find representation. *See id.* at 35-43. On December 2, 2015, the ALJ held a second hearing, at which Plaintiff appeared and testified. *See id.* at 44-87. On February 24, 2016, ALJ Greener issued an unfavorable decision, denying Plaintiff's claim. *See id.* at 12-34. ALJ Greener's decision became the Commissioner's final decision when, on September 1, 2017, the Appeals Council denied Plaintiff's request for review. *See id.* at 1-11.

## B.     Medical Records

### 1. Medical Evidence Before the ALJ

#### a. Mental Impairments

In June 2014, Plaintiff underwent a consultative psychiatric evaluation with Rebecca Fisher, Psy.D. *See* Tr. at 396-99. Dr. Fisher observed that Plaintiff lived with her three children, aged 7, 3, and 2. *See id.* at 396. Plaintiff was diagnosed with posttraumatic stress disorder ("PTSD") in 2006 due to sexual abuse by her uncle and father until the age of 11. *See id.* Plaintiff claimed to be suffering from nightmares and that she avoids reminder triggers related to her PTSD. *See id.* Plaintiff also reported that she suffers from depression, has crying spells, has

difficulty with motivation and concentration, becomes easily frustrated and overwhelmed, has diminished self esteem, and that she socially withdraws from others. *See id.* at 396-97.

According to Dr. Fisher, during her mental status examination, Plaintiff was cooperative and her social skills were adequate. *See id.* at 397. Plaintiff's appearance was normal and her speech was fluent and clear. *See id.* Further, Plaintiff's thought process was coherent and goal-directed with no evidence of psychosis. *See id.* Plaintiff's affect was depressed, her mood was dysthymic, and her sensorium was clear. *See id.* She was oriented to person, place, and time, and her attention and concentration were intact. *See id.* at 398. Plaintiff's recent and remote memory skills were intact. *See id.* Moreover, Plaintiff's intellectual functioning was average, with an appropriate general fund of knowledge. *See id.* Dr. Fisher indicated that Plaintiff did not appear to have any limitation in her ability to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, or make appropriate decisions. *See id.* Plaintiff had a moderate limitation in her ability to relate adequately with others and appropriately deal with stress. *See id.* Dr. Fisher noted that difficulties may be caused by posttraumatic stress, anxiety, and depression. *See id.* In conclusion, Dr. Fisher found that "[t]he results of the evaluation appear to be consistent with psychiatric problems, and this may at times significantly interfere with the claimant's ability to function on a daily basis." *Id.*

In July 2014, Dr. H. Tzetzo, a state agency medical consultant, reviewed the record and performed a mental residual functional capacity assessment. *See* Tr. at 405-07, 421. Dr. Tzetzo indicated that, in spite of moderate limitations, Plaintiff could understand and follow work directions in a work setting with low public contact, maintain attention for such work tasks, relate adequately to a work supervisor for such work tasks, and use judgment to make work-related

decisions in a work setting with low public contact. *See id.* Dr. Tzetzo indicated that Plaintiff's ability to deal with coworkers and the public was somewhat reduced, but was adequate to handle brief and superficial contact. *See id.* at 421. On January 30, 2015, Dr. M. Totin, a state agency medical consultant, affirmed Dr. Tzetzo's opinion. *See id.* at 452-65.

On December 30, 2015, psychiatrist Stephen Hudyncia began treating Plaintiff. *See id.* at 535. Dr. Hudyncia noted that Plaintiff appeared anxious, with rigid and tense motor behavior, emotional speech, and dysphoric mood/affect. *See id.* Plaintiff's thought processes were coherent, thought content was reality based, and her perception was appropriate. *See id.* at 536. Additionally, Dr. Hudyncia found that Plaintiff had good cognitive/intellectual functioning, attention, concentration, and insight, fair judgment, and no suicidal or homicidal ideations. *See id.* Dr. Hudyncia further noted that Plaintiff remained capable of caring for her three children. *See id.* at 535. In January 2015, Dr. Hudyncia completed a medical source statement indicating that Plaintiff had marked limitations in all areas of mental functioning. *See id.* at 528-30. He described Plaintiff as "most likely unemployable at this time and will remain so in the foreseeable future." *Id.* at 529.

On June 3, 2015, psychiatric nurse practitioner Timothy Jones completed a medical source statement relating to how Plaintiff's mental impairments impact her ability to do work-related activities. *See* Tr. at 471-73. Mr. Jones indicated that Plaintiff had a moderate impairment in the following work-related activities: understanding and remembering simple instructions, carrying out simple instructions, making judgments on simple work-related decisions, and interacting appropriately with co-workers and supervisors. *See id.* at 471-72. Mr. Jones further indicated that Plaintiff had "marked" limitations in understanding, remembering, and carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with

4

the public, and responding appropriately to usual work situations and to changes in a work-routine setting. *See id.* When asked to "[i]dentify the factors (e.g., the particular medical signs, laboratory findings, or other factors described above) that support your assessment," Mr. Jones states that his assessment is based solely on Plaintiff's "self report." *Id.* at 472.

### b. Physical Impairments

In February 2014, Plaintiff reported that she had not been treated by an orthopedist due to insurance/financial reasons. *See* Tr. at 365. Plaintiff reported that the pain in her shoulder was getting worse. *See id.* at 426-27. Her physician noted that she had signs of multidirectional instability with tendinitis. *See id.* Plaintiff was given a prescription for physical therapy and was instructed regarding the importance of a strengthening program. *See id.* Her physician further noted that she is otherwise a "[h]ealthy young woman in no acute distress" and that her neck had "good motion." *Id.* Moreover, although Plaintiff complained of numbness and tingling in her upper extremities, progress notes confirmed that an electromyography ("EMG") was negative. *See id.* at 360. From the end of April through May 2014, Plaintiff participated in several sessions of physical therapy and it was noted that she was responding well. *See id.* at 508-19. On June 4, 2014, however, a treatment note indicates that Plaintiff called to state that she had cancelled her recent appointments due to lack of childcare coverage. *See id.* at 507. The note indicates that Plaintiff declined to reschedule any additional appointments at that time. *See id.*

On June 20, 2014, Plaintiff underwent a physical consultative examination with Dr. Tanya Perkins-Mwantuali. *See id.* at 400-04. Plaintiff indicated that she was not taking any medication for her musculoskeletal symptoms or chronic pain. *See id.* at 400. Dr. Perkins-Mwantuali noted that cervical spine flexion was full, extension was 35 to 40 degrees, rotation was full, and her lateral flexion was full. *See id.* at 402. Plaintiff lumbosacral spine extension was 15 degrees,

flexion was full, and her lateral flexion was full. *See id.* Straight leg rasing was negative

bilaterally. *See id.* Additionally, Plaintiff had full range of motion and strength in her upper

extremities. *See id.* Among other diagnoses, Dr. Perkins-Mwantuali diagnosed Plaintiff with low

back pain with full range of motion in the lumbar spine, but sensory deficit in the bilateral,

medial, distal feet and toes and decreased strength in the right leg. *See id.* at 403. Dr. Perkins-

Mwantuali concluded that Plaintiff had "[m]ild limitation with walking, bending, kneeling,

crawling, squatting." *Id.* Later that month, Plaintiff's motor examination, including gait, was

normal. *See id.* at 432.

In July 2014, Dr. J. Dale, a state agency medical consultant, reviewed Plaintiff's medical

record and found that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds

frequently, stand and/or walk with normal breaks for about six hours in an eight-hour workday,

and sit for about six hours in an eight-hour workday. *See id.* at 435-40. Dr. Dale concluded that

Plaintiff's "limitations appear to be mild" and that she "appears to retain the capacity for light

work." *See id.* at 437.

On September 5, 2014, Plaintiff was seen at the MVHS-FSLHC North Utica Medical

Office. *See* Tr. at 798. Plaintiff indicated that she was there "to discuss disabilities" because she

was being reevaluated for disability and also that she would like to have her right foot examined

because she had injured it the previous day. *See id.* During the physical examination, it was

noted that Plaintiff was in no acute distress sitting on the examination table and that she had no

tenderness to the cervical spine with full range of motion "except feeling some pulling sensation."

*Id.* at 800. Additionally, Plaintiff exhibited "no reproducible tenderness to [the] spine" and had a

steady gait. *See id.*

On February 4, 2015, medical consultant A. Auerbach submitted a physical RFC assessment. *See id.* at 104-10. This evaluation resulted in nearly identical findings to those made by Dr. Dale in July 2014. The assessment noted all of the daily activities in which Plaintiff engages and concluded that, based on the lack of medical evidence, Plaintiff's allegations regarding her limitations cannot be found credible to the degree alleged. *See id.* at 108.

On December 18, 2015, Plaintiff was seen at the North Utica Medical Office for alleged neck spasms. *See* Tr. at 633. It was noted that, while Plaintiff had decreased range of motion in her neck and left shoulder, along with cervical paraspinal tenderness, she had normal sensation, reflexes, coordination, muscle strength, and tone. *See id.* at 637. An MRI scan from January 2016 showed central disc herniation at C6-7 without spinal cord impingement or stenosis, and mild posterior disc bulging at C3-4, C4-5, and C5-6 without spinal cord impingement or stenosis. *See id.* at 540.

### 2. Additional Evidence Submitted to the Appeals Council

In November 2016, Plaintiff presented to Dr. Ned Urbiztondo with complaints of radicular cervical pain into both arms extending into both hands with associated numbness and tingling. *See* Tr. at 1. Plaintiff also complained of mid back pain, which radiated around the ribs with severe muscle spasms, as well as radicular low back pain extending into both legs with associated numbness and tingling. *See id.* Plaintiff complained of having "constant dull achy, deep boring pain" and difficulty getting to sleep and staying asleep due to the increased pain. *See id.* Plaintiff reported that her pain increased with coughing and sneezing and that it "occasionally decreases with light stretching." *Id.* Plaintiff reported that she had previously completed a course of out-patient physical therapy for her low back pain with no significant or long term relief. *See id.* Further, Plaintiff denied epidural injections for neck, mid back, or low back pain. *See id.*

Upon examination, Dr. Urbiztondo found that Plaintiff was not in distress and did not exhibit any excessive pain behavior. *See id.* at 3. Plaintiff's mental status examination revealed intact judgment and insight; intact recent memory and remote memory; no signs of depression, anxiety or agitation; and she was oriented to person, place, time, and purpose. *See id.*

Upon musculoskeletal examination, Dr. Urbiztondo found that trigger points were present in the right and left lumbar paraspinals. *See id.* Range of motion showed flexion was 90 degrees, extension was 30 degrees, right and left lateral bending were 30 degrees, and right and left rotation was 30 degrees. *See id.* Additionally, Plaintiff had full strength, normal sensation, and her muscle stretch reflexes were 2/4 for both knees and ankles. *See id.* at 3-4.

Dr. Urbiztondo diagnosed Plaintiff with chronic low back pain, myofascial pain syndrome, and tendinitis and spinal enthesopathy of the lumbosacral region. *See id.* at 4-5. Dr. Urbiztondo ordered an MRI of the lumbar spine to evaluate further sources of pain, recommended bilateral lumbar paraspinal tendon sheath injections, and prescribed several medications to help with the pain and muscle spasms. *See id.*

## B. Additional Evidence Presented at the Administrative Hearing

On December 2, 2015, Plaintiff testified at an administrative hearing. *See* Tr. at 49-79. According to Plaintiff, she left her previous jobs due to headaches from bright lights, increased back problems and pain, and a general uneasiness communicating with her bosses. *See id.* at 53-54. Plaintiff testified that she could no longer work due a combination of factors, including the following: she disassociated, she zoned out, she had to stop what she was doing because of physical pain that made her lose focus, and after "standing up for too long [she would] have to bend down very close to the floor to stretch out [her] lower back so that [she would not] lose my legs' function." *Id.* at 54. Additionally, Plaintiff testified that while she can "go to the grocery

store and have a nice conversation with a cashier that [she] see[s] once in a while," she became uncomfortable being in close proximity to and interacting with people on a daily basis. *See id.* at 54-55. Moreover, Plaintiff reported pain throughout her body and that she had undergone a variety of unsuccessful treatments. *See id.* Plaintiff indicated that she has been taking Zololft for two or three years and that, while it is "helpful on rounding the edges," she still suffers from anxiety and general nervous feelings. *See id.* at 56-57. Plaintiff also noted that she has seen a psychologist for many years but had not seen her more recently because it was not helping. *See id.* at 57.

As to daily activities, Plaintiff testified that she normally brings her two older children to school and then generally takes care of her three-year old. *See id.* at 57-58. Additionally, Plaintiff testified that she tries "to keep up with the housework" and, when her three-year old is not home, she will take a nap or two during the day. *See id.* Plaintiff also indicated that she cooks and shops for her family and cleans her home. *See id.* at 58. On occasion, Plaintiff testified that she will spend time with friends and family. *See id.* As to hobbies, Plaintiff claimed that she enjoys writing, singing, reading, cooking, and doing puzzles. *See id.*

In response to questioning from her attorney, Plaintiff reported that her mental health symptoms had worsened since July 2014. *See id.* at 59-61. Plaintiff claimed that she has difficulty focusing and concentrating, and that she has started to felt uncomfortable around people with whom she had recently become friends. *See id.* at 61. Additionally, Plaintiff had recently visited a gastroenterologist and had been diagnosed with irritable bowel syndrome and could be developing celiac disease. *See id.* Plaintiff also described "sharp shooting pain" in her right arm that occurs when she is driving, requiring her to pull over until the pain stops. *See id.* at 71. Plaintiff further testified that she has "sharp shooting pains" in both her arms and legs on a daily

basis and that she constantly has a general discomfort in her low back. *See id.* As with her

mental health symptoms, Plaintiff testified that her physical ailments had gotten worse since July

2014. *See id.* at 72.

In addition to Plaintiff, Robert Baker, a vocational expert, testified at Plaintiff's hearing.

*See* Tr. at 80-86. The ALJ presented Mr. Baker with the following hypothetical:

> Let's assume an individual age 34 with a high school education and
> the same past relevant work that you just identified. This individual
> is able to perform work at a light level of exertion, but is limited by
> a mental disorder to simple entry-level work, and although the
> individual may work in proximity to others the tasks do not require
> working in conjunction with others and predominantly involve
> working with objects rather than people. Would there be any
> unskilled occupations such an individual could perform, and if so
> can you give us the name of the occupation, the DOT number, the
> exertional and skill levels, as well as the numbers of such jobs in
> the national economy?

*Id.* at 81-82. In response, Mr. Baker testified that such an individual could work as a

photocopying machine operator (DOT No. 207.685-014) with 82,064 jobs nationally; a router

(DOT No. 222.587-038) with 51,544 jobs nationally; or as a laundry worker, domestic (DOT No.

302.685-010) with 177,530 jobs nationally. *See id.* at 82. The ALJ then expanded the

hypothetical to include limitations to routine daily tasks and duties in the same workplace, which

do not significantly change in pace or location on a daily basis. *See id.* at 82-83. Mr. Baker

testified that the addition of these limitations would not preclude the performance of the above-

mentioned jobs. *See id.* at 83.

### III. DISCUSSION

**A.      Legal Standards**

   *1. Eight Step Analysis*

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court must examine the Administrative Record to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)) (other citations omitted). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

For purposes of SSI, a person is disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(c)(3)(A). To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A). "A recipient of benefits under this subchapter or subchapter XVIII of this chapter based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported" by substantial evidence, and the individual is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f)(1). If an individual is entitled to disability benefits, the individual's "continued entitlement to such benefits must be reviewed periodically," following a multi-step evaluation process. 20 C.F.R. § 404.1594(a).

The Commissioner has established an eight-step evaluation process to determine whether an individual continues to be disabled, as defined under the Social Security Act. *See* 20 C.F.R. § 404.1594(f). First, the Commissioner determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1594(f)(1). If so, the Commissioner will find that the disability ended. *Id.* If not, the Commissioner's review proceeds. Second, the Commissioner determines whether the claimant's impairment or combination of impairments meets or equals the severity of an impairment listed in Appendix 1. *See* 20 C.F.R. § 404.1594(f)(2). If so, the claimant's disability is said to continue. *See id.* If not, the Commissioner's review proceeds.

Third, the Commissioner determines whether there has been medical improvement. *See* 20 C.F.R. § 404.1594(f)(3). If there is no decrease in medical severity, there is no medical improvement. Upon finding medical improvement, measured by a decrease in medical severity, the Commissioner's review continues. Fourth, the Commissioner determines whether the medical improvement found in step three is related to the claimant's ability to do work in accordance with 20 C.F.R. § 404.1594(b)(1)-(4). Medical improvement is related to the ability to work if it results

in an increase in the claimant's ability to perform basic work activities. *See* 20 C.F.R. § 404.1594(b)(3). If medical improvement is unrelated to the claimant's ability to work, the Commissioner proceeds to step five. *See id.* If the medical improvement is related to the claimant's ability to work, the Commissioner proceeds to step six. *See id.*

Fifth, the Commissioner considers whether the exceptions to medical improvement listed in 20 C.F.R. §§ 404.1594(d) and (e) apply to the claimant's medical improvement. *See* 20 C.F.R. § 404.1594(f)(5). If none apply, the claimant's disability continues. *See id.* Sixth, if medical improvement is related to the claimant's ability to do work or one of the aforementioned exceptions applies, the Commissioner will determine whether the claimant's impairments are severe. *See* 20 C.F.R. § 404.1594(f)(6). When the evidence shows that all current impairments do not significantly limit the claimant's physical or mental abilities to perform basic work activities, the impairments are not severe and the claimant will no longer be considered disabled. *See id.*

Seventh, if the claimant's impairments are severe, the Commissioner will assess the claimant's residual functional capacity based upon all current impairments and determine whether claimant is able to perform past work. *See* 20 C.F.R. § 404.1594(f)(7). If capable of doing past work, the claimant is no longer disabled. *See id.* Finally, if the claimant can no longer perform past work, the Commissioner must determine whether the claimant is capable of other work given her residual functional capacity assessment and her age, education, and previous work experience. *See* 20 C.F.R. § 404.1594(f) (8). If the claimant is capable, her disability will have ended. *See id.* If the claimant is incapable, her disability is found to continue. *See id.*

### *2. Credibility Determination*

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. . . . The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quotations and citations omitted).

If a plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including the following: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether the plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. *See* SSR 96-7p, Policy Interpretation Ruling Titles II and

XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, *2 (Soc. Sec. Admin. July 2, 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the record. *Id.* at *5.

"After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." *Saxon v. Astrue*, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011) (citing, *inter alia*, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony "'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'" *Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *See Howe-Andrews v. Astrue*, No. CV-05-4539, 2007 WL 1839891, *10 (E.D.N.Y. June 27, 2007). With regard to the sufficiency of credibility determinations, the Commissioner has stated that

> [i]t is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2.

**B.     The ALJ's Decision**

In her decision, the ALJ noted that the most recent favorable medical decision finding Plaintiff was disabled was the decision from March 10, 2009. *See* Tr. at 17. As such, the March 10, 2009 decision is the "comparison point decision" or "CPD". *See id.* At the time of the CPD, the ALJ found that Plaintiff had the following medically determinable impairments: cervical and lumbar degenerative disc disease, fibromyalgia, depressive disorder, and posttraumatic stress disorder. *See id.* These impairments were found to result in the residual functional capacity to lift, carry, push, and/or pull ten pounds occasionally and less than ten pounds frequently, stand and/or walk for a total of two hours, and sit for a total of six hours in an eight-hour workday. *See id.* Further, at the time of the CPD, Plaintiff was unable (on a sustained basis) to understand, remember, and carry out simple instructions; respond appropriately to supervision, co-workers, and usual work situations, or deal with changes in a routine work setting. *See id.*

Thereafter, the ALJ made the following findings with regard to the period of July 15, 2014, the date Plaintiff's disability ended, through February 24, 2016, the date of the ALJ's decision. *See id.* at 17-21. First, the ALJ determined that, as of July 15, 2014, Plaintiff had not engaged in substantial gainful activity. *See id.* at 17. Next, the ALJ found that Plaintiff had not developed any additional impairments after the CPD through February 24, 2016 and that, with the exception of degenerative disc disease of the lumbar spine, Plaintiff continued to have the same impairments she had at the time of the CPD. *See id.* The ALJ determined that since July 15, 2014, Plaintiff's impairments did not satisfy any Listing. *See id.* at 19.

At the third step, the ALJ found that, as of July 15, 2014, medical improvement occurred. *See id.* at 21. Specifically, the ALJ noted that, at the time of the CPD, Plaintiff's treating providers advised that her mental and emotional functioning had deteriorated from prior levels, and that she had marked functional limitations. *See id.* Mental health treatment notes after July

15, 2014 show Global Assessment Functioning ("GAF") score of 60, which is indicative of moderate psychological symptoms. *See id.* The ALJ also noted that counseling records indicate that Plaintiff had not been seen for nearly two years, and that she stopped taking her psychotropic medications. *See id.* Further, the ALJ noted that progress notes described her as alert and cooperative with normal mood and affect, and normal attention span and concentration. *See id.* Further, it was noted that in February 2015, Plaintiff stated that her depression was well controlled and that her nightmares had decreased in frequency and intensity. *See id.* The opinions of Dr. Tzetzo and Dr. Totin both supported this conclusion. *See id.* Additionally, since the CPD, the ALJ found that Plaintiff no longer has a "severe" lumbar disorder. *See id.*

At the fourth step, the ALJ found that these improvements are directly related to Plaintiff's ability to do work. *See id.* at 21, 23. At the sixth step, the ALJ found that Plaintiff's cervical degenerative disc disease, fibromyalgia, depressive disorder, and posttraumatic stress disorder constitute "severe" impairments. *See id.* at 18. At the seventh step, the ALJ determined Plaintiff's RFC, taking into consideration Plaintiff's severe and non-severe impairments. *See id.* at 21-23. As of July 15, 2014, the ALJ determined that Plaintiff had the RFC "to perform light work as defendant in 20 CFR 404.1567(b) except she is limited to simple, entry-level work, and although she may work in proximity to others, the tasks do not require working in conjunction with others and predominantly involve working with objects rather than people. In addition, she is limited to routine daily tasks and duties in the same workplace which do not significantly change in pace or location on a daily basis." *Id.* at 21. Further, the ALJ found that Plaintiff's impairments continued to be severe, and that, as of July 15, 2014, she was unable to perform her past relevant work. *See id.* at 26.

At the eighth and final step, relying on the vocational expert's testimony, the ALJ found that other work existed in the national economy for Plaintiff to perform, given her FRC, age (younger individual), education (at least high school), and ability to communicate in English. *See id.* at 26-27. As such, the ALJ concluded that Plaintiff's disability ended on July 15, 2014, and that she had not become disabled since that date. *See id.* at 27.

**C.  Application**

*1. Plaintiff's Lumbar Spinal Degenerative Disc Disease Substantially Improved*

In the present matter, the Court finds that the ALJ properly found that Plaintiff's lumbar spine disorder was no longer severe as of July 15, 2014. *See* Tr. at 17. At the time of the CPD, Plaintiff's degenerative disc disease of the lumbar spine was severe. *See id.* at 93. A previous MRI revealed mild discogenic disease and a diffuse posterior bulge at L1-2, and EMGs demonstrated radiculopathy. *See id.* at 18, 94.

As the ALJ correctly observed, since the CPD, while Plaintiff categorized her lower back pain as three-to-eight out of ten, her lumbosacral spine extended to fifteen degrees, flexion was full, lateral flexion was full, the straight leg raise was negative bilaterally, range of motion was full in the lower extremities bilaterally, and deep tendon reflexes were physiologic and equal in the lower extremities. *See id.* at 18, 402. Further, progress notes demonstrated that Plaintiff denied experiencing back pain in November 2013 and February 2014. *See id.* at 367, 382. The ALJ also observed that Plaintiff did not begin complaining about back pain until after her disability benefits were terminated: in November 2015, she complained of chronic back pain, but the only diagnostic image available was from 2009, and Plaintiff denied receiving treatment for her back pain, seemingly since 2009. *See id.* at 18, 656.

18

Additionally, Dr. Perkins-Mwantuali categorized Plaintiff's condition as "low back pain," which is not consistent with a condition imposing significant functional limitations. *See id.* at 18, 403. Given these findings, Dr. Perkins-Mwantuali opined that Plaintiff had only mild limitations with walking, bending, kneeling, crawling, and squatting. *See id.* at 403. This opinion is further supported by Plaintiff's admission that she spends her days "running around" after her youngest child and performing housework. *See id.* at 57-58; *see also Waldau v. Astrue*, No. 5:11-cr-925, 2012 WL 6681262, *4 (N.D.N.Y. Dec. 21, 2012) (citations omitted).

Accordingly, the Court finds that substantial evidence supported the ALJ's conclusion that Plaintiff's lumbar disorder had improved to be no longer severe.

### 2. Plaintiff's Mental Impairments Decreased in Severity

As with Plaintiff's lumbar disorder, the Court finds that substantial evidence supported the ALJ's determination that Plaintiff's mental health impairments decreased in severity. As the ALJ noted, in August 2013, counseling records indicated that Plaintiff had not been seen in counseling for nearly two years and that she had stopped taking her psychotropic medications. *See* Tr. at 21, 871. Plaintiff had reported that she suffered an increase in anxiety without medication and that Zoloft had previously made a difference. *See id.* at 871. Progress notes in November 2013 described Plaintiff as alert and cooperative with normal mood and affect, and normal attention span and concentration. *See id.* at 382. Further, in February 2015, Plaintiff indicated that her depression was well controlled and that her nightmares had decreased in frequency and intensity. *See id.* at 876. Additionally, both reviewing psychological consultants, Drs. Tzetzo and Totin, opined that the record evidence supported a finding of mental health improvement. *See id.* at 405-07, 421, 452-65.

The ALJ also noted that Mr. Jones and Dr. Hudyncia's opinions suggested more significant mental limitations. *See* Tr. at 471-73, 528-30. In giving these opinions limited weight, the ALJ correctly pointed out that these opinions relied almost exclusively on subjective reports and that there were limited abnormal clinical findings. *See id.* at 23-24, 472. The ALJ's findings closely tracked the regulatory factors for weighing medical opinion evidence. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion"); *see also Roma v. Astrue*, 468 Fed. Appx. 16, 19 (2d Cir. 2012) (affirming the ALJ's decision to give less weight to a doctor's opinion because it was based largely upon the subjective statements of the plaintiff, who the ALJ had reasonably found to be less than fully credible); *Baladi v. Barnhart*, 33 Fed. Appx. 562, 564 (2d Cir. 2002)

As to Dr. Hudyncia's assessment, the ALJ properly found that it was not supported by objective evidence, including his own evaluation. *See* Tr. at 24. Dr. Hudyncia made largely normal findings during the mental status examination, and observed that Plaintiff remained capable of caring for her three children. *See id.* at 535-36. Further, Dr. Hudyncia only began treating Plaintiff on December 30, 2015, long after her disability ceased. *See id.* at 535. Additionally, Dr. Hudyncia's opinion is belied by the objective evidence elsewhere in the record demonstrating limited abnormalities, including Dr. Fisher's observations, and the improvement in Plaintiff's mood when she was consistent with her medication. *See id.* at 397-98, 450; *see also Cichocki v. Astrue*, 534 Fed. Appx. 71, 75 (2d Cir. 2013) (affirming the ALJ's decision to afford less than controlling weight to a treating physician where the opinion conflicted with his own treatment notes, including evidence that a mental health impairment was effectively managed through medication and therapy).

Based on the foregoing, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's mental health had improved since the CPD.

### 3. The ALJ's RFC Finding Was Supported by Substantial Evidence

In the present matter, the Court finds that the ALJ properly determined that Plaintiff retained the FRC to perform a range of unskilled, light work. *See* Tr. at 21-25. As discussed, the evidence with respect to Plaintiff's mental impairment showed normal mental status examinations and substantial gaps in treatment. *See id.* at 382, 397-98, 536, 871, 876. Further, the ALJ noted that Dr. Fisher found that Plaintiff did not have any limitations for following and understanding simple directions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, or making appropriate decisions. *See id.* at 398.

While Dr. Fisher did note that Plaintiff had "moderate" limitations for relating with others and appropriately dealing with stress, Dr. Tzetzo indicated that, in spite of moderate limitations, Plaintiff could understand and follow work directions in a work setting (with low public contact), maintain attention for such work tasks, relate adequately to a work supervisor for such work tasks, and use judgment to make work-related decisions in a work setting (with low public contact). *See id.* at 398, 405-07, 421. Dr. Tzetzo further considered that Plaintiff's ability to deal with coworkers and the public was somewhat reduced, but was sufficient to handle brief and superficial contact. *See id.* at 406, 421. These findings were affirmed by Dr. Totin. *See id.* at 452-65.

The ALJ incorporated these findings into the RFC for simple entry-level work, and work in proximity to, but not in conjunction with others. *See* Tr. at 21. The ALJ also limited Plaintiff to working predominantly with objects, rather than people. *See id.* To account for her stress, the

ALJ limited Plaintiff to routine daily tasks and duties in the same workplace which do not significantly change in pace or location on a daily basis. *See id.*

The ALJ also properly determined that Mr. Jones' opinion was entitled to less than controlling weight considering Plaintiff's infrequent treatment, particularly prior to the cessation of her disability benefits, the limited abnormal clinical findings identified in his treatment notes, and the fact that he advised that his assessment was based largely on Plaintiff's self-reports. *See id.* at 23-24, 472, 871. Further, Mr. Jones own treatment notes belied his opinion that Plaintiff had "marked" limitations. These notes clearly demonstrate that Plaintiff had only moderate symptoms and difficulties. *See id.* at 342. Despite these findings, the ALJ still accounted for some of the limitations noted by Mr. Jones by limiting Plaintiff to work that was not detailed or complex in nature and work that would require very limited social contact. *See id.* at 21, 24.

As to physical limitations, the ALJ observed that treatment notes reflected extremely limited treatment for Plaintiff's cervical disorder and fibromyalgia, and that the findings were largely normal. *See id.* at 22, 360, 365, 549-49, 799-800. Further, the ALJ noted that Plaintiff was not taking any medications for her musculoskeletal pain during the evaluation. *See id.* at 22, 400. Dr. Perkins-Mwantuali believed that Plaintiff had only mild limitations for walking, bending, kneeling, crawling, and squatting. *See id.* at 403. Dr. Dale further found that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for approximately six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. *See id.* at 436-40. These limitations were incorporated into the RFC for light work. *See id.* at 21.

Based on the foregoing, the Court finds that the ALJ properly supported the RFC determination.

### *4. The ALJ's Finding as to Other Work*

At the final stage, the ALJ properly determined that other work existed in the national economy for Plaintiff to perform.  *See* Tr. at 26.  As discussed above, a vocational expert testified at the hearing that someone with Plaintiff's age, education, work experience, and RFC could work as a photocopy machine operator, router, and laundry worker (domestic), and that there are more than 200,000 jobs available nationally.  *See id.* at 82-83.  Since the RFC was properly supported by substantial evidence and because the hypothetical posed to the vocational expert accurately reflected a person with Plaintiff's physical and mental impairments, the ALJ was entitled to rely on the vocational expert's testimony in finding that jobs existed in the national economy which Plaintiff could perform.  *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).

As such, the Court finds that the ALJ's decision was supported by substantial evidence.

### *5. Evidence Submitted to the Appeals Council*

The Commissioner is required to consider evidence submitted to the Appeals Council when it is "new" and "material."  Under the regulations,

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).[2]

---

[2] The Court notes that, effective January 17, 2017, the language of 20 C.F.R. § 404.970(b) was amended.  It now provided that new evidence will only be considered by the Appeals Council if "good cause" is shown for not submitting the evidence to the ALJ, with "good cause" falling into several narrowly defined categories.  Although the Appeals Council denied Plaintiff's appeal

(continued...)

In support of her appeal, Plaintiff submitted additional evidence that was not presented to the ALJ. On November 1, 2016, Plaintiff was seen by Dr. Ned Urbiztondo for a new consultation. *See* Tr. at 1-5. Plaintiff complained of having mid and low back pain, that radiated into her arms and legs, with associated numbness and tingling. *See id.* at 1. Plaintiff further complained of having constant "dull achy, deep boring pain" that caused difficulty sleeping. *See id.* Plaintiff further stated that she believed that her condition was worsening. *See id.*

Upon examination, Dr. Urbiztondo found that Plaintiff was well dressed, in no distress, and exhibited no excessive pain behavior. *See id.* at 3. Plaintiff's judgment and insight were intact, she was oriented to person, place, time and purpose, her memory was intact for recent and remote events, and she did not exhibit any signs of depression, anxiety or agitation. *See id.* Dr. Urbiztondo's musculoskeletal examination of Plaintiff resulting in findings almost entirely consistent with the earlier examinations presented to the ALJ. *See id.* at 3-4.

Dr. Urbiztondo diagnosed Plaintiff with chronic low back pain, myofascial pain syndrome, tendinitis and spinal enthesopathy of the lumbosacral region, and provided prescriptions. *See id.* at 4-5. Dr. Urbiztondo also requested an MRI of the lumbar spine to further evaluate sources of pain and recommended bilateral lumbar paraspinal tendon sheath injections. *See id.* at 5. No additional evidence was presented to the Appeals Council.

As the Appeals Council correctly noted, the treatment notes were from November 1, 2016, but the ALJ decided Plaintiff's case through February 24, 2016 and, therefore, the "new evidence" did not relate to Plaintiff's current claim. Even if this evidence was relevant to the time frame at issue, it would not change the outcome of the ALJ's decision. Even if the evidence indicated a

---

[2](...continued)
on September 1, 2017, her appeal was filed prior to the effective date of the amended regulation. As such, the Court will apply the regulation in effect at the time Plaintiff filed her appeal.

medically determinable, even a slightly more severe lumbar impairment, there is no indication that it imposed any limitations beyond an RFC for light work.

Accordingly, the Court finds that the Appeals Council did not err in upholding the decision of the ALJ.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: October 25, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge